This case is Perez v. Garland, Appeal No. 22-2434. Mr. Budzinski, whenever you're ready.  Two issues today. First, whether the immigration judge applied an erroneously heightened condones or helpless standard and the related exhaustion issue raised by the respondent. And two, whether the immigration judge's unable or unwilling determination is supported by substantial evidence. Turning first to the standard, the immigration judge concluded that petitioners failed to show the government of Guatemala either condones the persecution or is helpless to prevent it. So can I just ask you, you know, I would agree with you that that doesn't sound quite like unable or unwilling, condoning or helpless. You could be unwilling but still able to do it or you could actually be helpless. But my question is, when I go through the immigration judge's full opinion, the condones or helpless thing pops up only once. And so I wonder if it's a fair characterization of the judge's opinion to say that the wrong standard was being used. That the correct standard is there so often. Sure, the correct standard is written but I don't think we can be confident when when he uses the language condones or helpless that he did not or he did apply the correct standard. This court has used that language but I don't think it has ever applied such a standard. In Juan Antonio and Grace, Sixth Circuit and the District Court of the District of Columbia both concluded that this is an impermissibly heightened standard. Well can I just, I don't mean to belabor this, but if you go to page 5 of the immigration judge's opinion, appendix 11, that's when the judge on the past persecution ground moves to what turns out to be the stumbling block here. The judge makes favorable findings for her for a number of other things. And the standard is correct. She's failed to carry her burden to show that government authorities in Guatemala were unable or And the next sentence repeats it. And then there's just sort of this wrap-up sentence at the end of, right above where well-founded fear of future comes in. And so I'm just concerned, especially given the deferential standard of review we have, that we shouldn't seize on a phrasing that may or may not be the correct phrasing. It's taken from the horror case, quoting the horror case. You know, we shouldn't remand things for a better opinion. You know, we should remand only if there is actually a legal error. Sure, and I understand that. And what I would say is beyond whether the immigration judge should be reversed for applying an incorrect standard, it's still important, I think, to clarify or to decide what is the correct standard, at least insofar as we're applying it here, and so that trial court judges and the board are clear on what they should be applying. In Grace, it discussed one of the court's, this court's, decisions, Galena, in which it also used this phrase. And it concluded that that standard was not applied because there the applicant was threatening phone calls, her husband called the police to report the threatening phone calls, and the police located one of the callers, and the call stopped. The court reasoned that while the police might take some action against these telephone threats, the applicant could still face persecution if removed because she could have been killed. And because of this, Grace concluded that this is not a condones or helpless standard this court is applying, and that while the police might take some steps, applicants can still meet the threshold when the police are unable to provide effective help. Mr. Penzinski, did you raise this issue with the board? No, it was not in the administrative brief before the board, and what I've argued in my reply brief is that because the board affirmed the immigration judge without opinion, we are reviewing only the decision of the immigration judge. But does that make sense given the exhaustion requirement? I had the same question Judge Hamilton did. Had you presented, or had, you know, I don't mean to be personal about this, but had it been presented to the board, and the board had been alerted to the fact that there are these potentially two different standards out there, the board might not have affirmed without opinion. The board might have thought, oh, you know, we need to sort this out a little bit better. Yeah, and that was the majority opinion in the case I cited Zara. The dissent disagreed there, citing the regulation 1003.1E4, and that regulation requires the board, before summarily dismissing an opinion, to one, confirm that the correct result was reached, and that any errors in the decision are harmless or non-material. And the dissent read that, and I agree, that that means that the board has to review the decision as a whole and not just the issues raised. And the way I think of it is, in effect, by doing that they're waiving the requirement of exhaustion. Turning to the substantial evidence inquiry, first the immigration judge took issue with the fact that Nario did not report every instance of harm to authorities. However, this is not required if it would have been futile or subjected her to further abuse, and this is exactly what Nario contended. She cited... But there's, I mean, the immigration judge that wasn't persuaded, because the immigration judge says as soon as she does actually go to the court seriously, she gets this six-month separation order, and that lasts for about three or four days, as I understand it, and then she just decides, never mind, you know, I'm going to flee the country, goes through and... But how do we know that it's futile? How do we know that the Guatemalan government would have taken no steps to back up that separation order? There I think we need to turn to the country conditions evidence. And the country conditions evidence bears out that Guatemala suffers from a machista culture that treats women as inferior and has normalized violence against women, has one of the highest femicide rates in the world, and indigenous women like Nario are marginalized even further. It also discusses widespread corruption, which of course affects investigation and prosecution, both of which are inadequate, and the judicial system fails to provide fair or timely trials due to inefficiency, corruption, insufficient personnel, and intimidation of judges, prosecutors, witnesses. So the only particularized evidence about that that I remember from this record was when the earlier proceeding had resulted in kind of a consensual, I won't bother you and you won't bother me, between Nario and Walter, he immediately ignores it, at least according to her. And again, the IJ finds this credible testimony. So I would also note, I don't know exactly how this works in Guatemala, but I found it odd when Nario was given the option to pursue a criminal case. At least my experience here in the United States, that charging decisions are usually going to be done by a prosecutor, particularly when it involves, you know, undue familial pressures that one might have in a domestic situation like this. And, you know, even if the alleged victim says that, I don't want to go forward with this, I'm scared, the prosecutor is well within their power to go ahead and file charges if they think that's in the best interest. But they might not, even here, you know, if the victim isn't willing to press charges, it seems to me prosecutorial discretion is often exercised in this direction. So that might not happen. It just struck me as odd in addition to the amicable remuneration you mentioned. Go ahead. Sorry, go ahead. Well, Mr. Budzinski, let me just get to my problem. Obviously, this is a pretty compelling story and I can certainly... And the immigration judge found this persecution was real and that your clients were vulnerable, unable to do a lot there, to protect themselves. It's certainly easy to imagine another immigration judge having weighed these factors differently and found a sufficient showing. But what I struggle with is, at least as I understand our standard of review, the question is, was what evidence required the immigration judge to find that the Guatemalan government was unable or unwilling to protect them? So, first, I would note that the two instances where she was able to do something either with the amicable agreement or with the protection order, Walter didn't stop. He became angered. He demanded that she withdraw the complaint. This is when she became scared and left the country. In addition to that... I understand that. Yeah. But that's not the question. The question is, why was... The focus is on the government of Guatemala and evidence that would have required any reasonable immigration judge to find it was unable or unwilling to protect the petitioners here. So, I would point to the country conditions evidence regarding Guatemala. It generally states that Guatemalan authorities failed to offer... That would tell us that everybody from Guatemala who feels persecuted can get to this country as a refugee, right? Just the women. Oh, sorry. Oh, yes. Okay. Well... And the children who come with them, which is... Assuming they've been... That's just way too broad of a theory. So, I think we might be getting into another legal point there, but... So, I don't think broadness is necessarily a prohibition against offering protection within... No, but let's... Look, if your theory is that anybody who experiences persecution based on protected criteria in Guatemala cannot count on protection from the government and is therefore gonna qualify for refugee status in the United States, that's a pretty extraordinary theory. Is that the theory? Yes, I believe it is. Okay. Thank you. Thank you. Thank you. Mr. O'Connell. Good morning, Your Honors. Joseph O'Connell, on behalf of the respondent, the Attorney General. Your Honors, the agency correctly concluded that Ms. Nerio's applications failed because she couldn't show that the government of Guatemala is unable or unwilling to protect her. This is a factual finding that's reviewed for substantial evidence, which means that the petitioners have to show that the record compels an inclusion that is contrary to the agency. So, let's not say they correctly determined that. This is a very disturbing case and I'm... Yeah. I'm very concerned that if she's removed and sent back to Guatemala, things could go very badly for her. But if you're saying that given the standard of review, the agency could have come to that conclusion even if other people might not have, then, sir, that's a different point. I think that's probably better stated. The standard of review, I think in this case, dictates the result. And so, I don't think the petitioners have shown that the government of Guatemala is unable or unwilling to protect her in this instance, especially given the specific evidence. There's a lot of evidence showing how serious the problem of violence against women is in Guatemala in particular. There's a huge amount of evidence. But I think... It's just this one little country report that we have. Of course. But I think that in that instance, the specific evidence, the particularized evidence, in this case, shows that the first time Ms. Nerio went to the Guatemalan authorities, they responded immediately and they granted her a six-month restraining order against Walter. And so, again, she left Guatemala three or four days later. But again, this is the first time that she ever went to the Guatemalan authorities. And so, there's no indication that they would have not been able or willing to protect her. And this also is important because Ms. Nerio could have filed a police complaint against Walter, but she voluntarily chose not to do so. And she said she voluntarily chose not to do so because she didn't want to create a conflict with her in-laws. And that's at page 114 and 115. They asked her, why didn't you file a police complaint? She said, well, it's family and I didn't want to cause a problem for the in-laws in that family. I mean, think about that. It tells you quite a bit about power relationships. It's certainly not unreasonable, but it also means that she doesn't qualify for asylum or withholding in this case. It's something that she has to do to to establish her eligibility for relief and protection. It's, again, it's not unreasonable and in no way minimizing the circumstances of what is basically a ugly racial domestic dispute between in-laws. She still has the requirement that she has to go to the police. It's just a basic, it's just a basic principle of asylum and withholding. Before you can flee to the without applying for asylum, it's a different story. You have to, you have to give the Guatemalan government a chance to do something about it. And when she did, they responded immediately. And she only, and she only asked for a restraining order, which they gave her immediately. And again, she could have pursued criminal charges against Walter, but she voluntarily decided not to. And there's no evidence in the record, I take it, about the effectiveness of these restraining orders in Guatemala. There are studies in the United States, for example, when restraining orders are entered, how often are they violated and what courts need to do to follow up and what police resources are available if they're disregarded and so on. I mean, you could certainly. Certainly, but I didn't see any evidence in the record when I reviewed it. And that also sort of goes back to the petitioner's burden of proof. So, it's Ms. Neria's burden to submit that evidence and make the arguments in that regard. And there, I didn't see any evidence saying that restraining orders are not effective. And she didn't give it a chance to work. So, there's one instance where she said that Walter, once the restraining order was issued, Walter went crazy. That's a characterization, but another way to say that is, he became upset. The only specific allegation to be violent when he gets upset. That's the problem with Walter. That's correct, but again, this is the first time that she's went to the Guatemalan authorities to they responded appropriately. And I think we filed a 28-J a few days after it was issued in Osorio Morales, which was issued in July of this year. And it basically said, you have to give the native government a chance. We don't know what they're going to do if you don't report it. And again, she had the chance to file a police complaint, but she again, she voluntarily. It's kind of the one free bite approach, I guess. And if she happens to draw the short straw in the Again, it's just a requirement for asylum. I mean, she has to give them a chance to protect her. So, are you saying there's no possible showing that somebody could make that would be enough to show that the home government wasn't willing to do it? Like, we don't protect people of XYZ ethnic group? I'm not, I'm not saying that. There are instances, there is a futility exception. And a good example of the futility exception is the board's precedential decision we cited in our brief. It's called Matter of S.A. And it involved this sort of a domestic dispute between the father and the daughter. And the daughter was being abused by the father. And in that case, the evidence showed that the daughter went to the authorities in Morocco and reported her father. Not only would they not help her, they would take her back to her father and she would be subject to worse abuse. And so I think that's an excellent example of, you know, the futility exception where you don't have to report. In this instance, again, the Guatemala authorities responded the best way, the best way they could. Again, they did everything that that was asked of them. And again, she had the opportunity to do even more, including file a police complaint, which she again, voluntarily decided not to, for reasons that are not persuasive. I mean, they're certainly compelling, but they don't. They're saying they're just not legally significant reasons. Right, that's exactly right. If I could just quickly address the exhaustion and condone complete helplessness argument. Your Honor sort of stated my argument before I could get up here and say it. The decision of the board to affirm without opinion is affected by whatever arguments that the petitioners raise to the board. So again, if the petitioners raise this condoned complete helplessness argument, the board might not have affirmed without opinion. They might have addressed the argument on the merits and said something and clarified it. But even putting exhaustion aside, there's nothing really to the substance of the condoned complete helplessness language insofar as the IJ in this case at page 68 of the record is literally quoting this court's case law from Behora. And so I'm not sure how you can find fault with an IJ quoting basically this court's case law. And again, there's no indication that these are two different standards. They're basically just synonyms. They don't sound the same, but just like the court has held, it's just another way to say it. And again, there's no evidence that two standards were applied. As Your Honor noted, the IJ said unable or unwilling to protect her several times. And again, the IJ- That's a better argument than synonyms, I'll just say from my point of view. I think it is hard to find fault with an IJ for quoting the court's case law. I would make that argument as well. But again, I think the court does not need to get to this issue because it wasn't exhausted for the board. So unless there are any questions of the government, we would rest on our briefs. Thank you, Mr. O'Connell. Mr. Budzinski, you're out of time, but we'll give you a minute of rebuttal if you'd like. I have nothing further to add, Your Honors, unless there are any questions. Thank you. Thank you. Okay, we'll take the case in our advisement. We'll move to our next case.